FILED
2009 Feb-24  PM 01:33
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# EASTERN  DIVISION

| | |
|---|---|
| JOHNNA K. TARVER, | ] |
| | ] |
| **Plaintiff,** | ] |
| | ] |
| v. | ] |
| | ]    CV-07-BE-1570-E |
| SOUTHERN DEFENSE SYSTEMS, | ] |
| INC., | ] |
| **Defendant.** | ] |
| | ] |
| | ] |
| | ] |

## MEMORANDUM OPINION

This matter is before the court on "Defendant's Motion for Summary Judgment" (doc. 39).  Plaintiff's Complaint contains six counts: Count I, alleging a violation of the Equal Pay Act based upon gender discrimination; Count II, alleging a violation of Title VII for gender-based disparate treatment of workers with care-giving responsibilities; Count III, alleging a violation of Title VII for gender-based pay disparities; Count IV, alleging a violation of Title VII for gender-based constructive discharge because of pay disparities and disparate treatment; Count V[1], alleging a violation of Title VII for gender-based retaliation; and Count VI, alleging a violation of the Americans with Disabilities Act. For the reasons stated in this Memorandum Opinion, the court will GRANT the motion in part as to Counts I (Equal Pay Act), III (Title VII gender-based pay discrimination), V (Retaliation), VI (ADA); and  DENY it in part as to Count II (Title VII

---

[1]Because the Complaint contains two counts identified as "Count IV," the court has renumbered the counts to avoid confusion.  (doc. 1).

1

gender-based disparate treatment) and Count IV (Constructive Discharge).

## I. FACTS

This case arises out of the employment of Plaintiff, Johnna K. Tarver, with Defendant, Southern Defense Systems, Inc. ("SDS"), a company located in Eastaboga, Alabama that manufactures metal containers. On or about September 15, 2004,  Tarver applied for a welding job with SDS at the encouragement of the welder supervisor, Wil Sheffield, who had worked with Tarver in the past for a different employer.  Tarver had worked for SDS on two previous occasions, the first time in 1993 and the second time for a few months in 1996-1997. On the second occasion, she earned an hourly wage of $10.50 and claims that she quit because one of the co-owners at the time, Don Knight, was "hitting on" her.  She did not file a charge of discrimination against SDS or Don Knight on that occasion.  At the time of her September 2004 application with SDS, Tarver confirmed with Sheffield that she would not be working with Knight.

Although Tarver's 2004 job application with SDS reflected that she had welding experience, it listed no welding jobs from 1997 to 2004 and did not request a specific rate of pay. SDS hired Tarver as a Class "A"[2] welder effective September 17, 2004.  Sheffield recommended that SDS hire Tarver, and Michael Chan, the operations manager of SDS,  approved the hire. Sheffield explained that "[Tarver's hiring] was not liked, but I needed welders bad.  So they let me hire her."  (doc. 44, Ex. 85, at 18).  According to Sheffield, Chan normally hesitated to hire women or welders who had previously worked for SDS.

---

[2]Class "A" welders generally have 3-5 years of experience while Class "B" welders generally have under 3 years of experience.

2

As welder supervisor, Sheffield set the rate of each welder's pay subject to the approval of Chan and Charles Cheng, the owner and president of SDS.  In Tarver's case, Sheffield decided to pay her $12 per hour, which is the minimum starting rate that he generally pays employees who can weld aluminum.  Welders who do not have aluminum expertise would start in the $7-10 per hour range.  At the time of her hiring, Tarver advised Sheffield that she had already purchased a ticket for a Wyoming vacation in December of 2004, and Sheffield agreed to allow her to take that trip as an excused absence.

Tarver claims that she did not receive an employee handbook[3] upon her hire in 2004. However, because she refers to the employee handbook provisions in her argument that SDS discriminated against her in applying its employment policies, the court notes several of those provisions.  The handbook provides for a 90-day probationary period for all newly hired and re-hired employees, and states that employees will not be eligible for insurance benefits during this period.  The handbook's provision regarding insurance benefits is self-contradictory; it states that insurance coverage only extends to permanent, full-time employees who complete a *120-day probationary period* but then states that insurance coverage will be effective "on the first day of the month <u>after</u> the successful completion of the *90-day probationary period."* (Def. Ex. 41-6, at 23 [page 4 of the handbook]) (emphasis added)*.*   With respect to absences and attendance, the handbook states that three or more unexcused absences within a 90-day period establish grounds for termination and that "[t]wo tardies/leave early are equivalent to one unexcused absence."

---

[3]The record includes a copy of the SDS employee handbook, but that copy includes a notation that this version was revised 3/21/05 – after Tarver was hired, and after her last day of work with SDS.  Hester testified that the only revision made in 2005 involved changing payment information from weekly to bi-weekly; other than that change, the handbook in the record would be the same as the one in effect during Tarver's employment.

(Def. Ex. 41-7, at 1 [page 7 of the handbook]).

Anita Hester, the SDS employee who is responsible for payroll and other office duties, told Tarver that she would be eligible for health insurance benefits after being employed for 90 days. Although Hester says that SDS's health insurance carrier, Blue Cross Blue Shield of Alabama, changed its policy after Tarver's hiring and required that 120 days of employment elapse before the employee could become eligible for those benefits, no evidence exists that SDS notified Tarver of this change.

SDS required Tarver to take a welding certification test upon her hire in 2004, and she passed her certification test upon her first attempt. Tarver's first 2004 work evaluation purported to be a 30-day evaluation but was dated November 15, 2004, when Tarver had been at work approximately 60 days. That evaluation showed good attendance, completion of all of her work, great productivity, and great quality of work. It also showed that Tarver still required supervision. Tarver's second evaluation purported to be a 60-day evaluation but was dated December 13, 2004, when Tarver had completed 90 days of service with SDS. This evaluation showed good attendance, completion of all of her jobs on time or early, and great work quality. The second evaluation also indicated that Tarver still required supervision; however, Sheffield explained that although all of the welders under him require supervision, Tarver required less supervision than the other welders at SDS in 2004. Tarver never had any welds returned to her for quality problems. Although the second evaluation includes a notation that Sheffield requested a fifty-cent per hour raise for Tarver, Tarver did not receive a raise in December, 2004. Describing Tarver's work in his deposition testimony, Sheffield stated: "She can outweld all of [the men] out there" and had excellent skills. (doc. 44, Ex. 85, at 21, 24).

4

Tarver signed these two evaluations.  She claims to have enjoyed her job at SDS, but further claims that she was not treated the same as the men in the welding shop.  According to Tarver, Chan and Cheng would come to the welding shop and shake every guy's hand but would not shake Tarver's hand.  In addition, she resented Michael Chan's practice of staring at her from across the room.   Sheffield testified that Chan watched Tarver more than the other welders because she was female.  Sheffield explained to Tarver that "Michael [Chan] didn't like [Tarver] working out there . . .he didn't like women working out there" (doc. 44, Ex. 83, at 130-31), and that Chan advised Sheffield "that [because Tarver] was a woman, that [Sheffield] was spending too much time over there with [her]."  (doc. 44, Ex. 83, at 50).  Although Tarver complained to Sheffield, her supervisor,  about Chan's staring, she did not complain to Chan or Cheng; she never spoke to either of those men until after she stopped working for SDS.

Tarver's first 90-day period of service as an employee of SDS was completed as of December 16, 2004.   During the first 90-day period, Tarver's Absentee Report reflects the following absences: 29 *hours* unexcused (3 complete days out and 2 days left 2.5 hours early - not listed as excused, so presumed unexcused), and 1 *hour* excused for doctor's appointment.

Soon after the 90-day anniversary, Tarver approached Sheffield and asked him to speak with Cheng about her eligibility for health benefits. Tarver had discussed with Sheffield and Hester her plan to adopt a relative's baby and her concern that the baby might be born with special needs because of the birth mother's drug problems.  In light of that plan, she was particularly interested in obtaining health insurance for the baby, as well as the other benefits that came with permanent employment.  Tarver also planned to continue to work full time after adopting the baby and to hire a full time care-giver for that baby so that she would be able to do

5

so.  She communicated these plans to Sheffield, and did not ask Sheffield or anyone else at SDS to reduce her work hours.

Sheffield spoke with SDS management about Tarver's 90-day anniversary and her request for health benefits and may have also advised management about her adoption plans.  In any event, Cheng acknowledges that at the time of Tarver's second evaluation on December 17, 2008, Chan had already advised Cheng that Tarver was planning to adopt a baby.  As further evidence of the company's knowledge of the adoption, the name of the birth mother was handwritten on the company's copy of Tarver's paystub dated December 31, 2004.  Sheffield advised Cheng of Tarver's intent to continue to work after the baby was born.

After the completion of her 90-day period with SDS in 2004, Tarver did not receive notification that her employment status was changed from probationary to permanent. She did not work the day after Christmas, but took her Christmas trip to Wyoming that she and Sheffield had discussed at the time of her hiring and Sheffield had promised to excuse.[4]  She returned to work in January 2005, and continued to work full-time.  On January 24, 2005, Peyton Tarver was born.  Tarver adopted Peyton and hired a full-time nanny to care for him.  Peyton suffered from colic and currently has asthma, but functions as a normal child.

At some point after Tarver's 90-day work anniversary, most probably in early-to-mid February of 2005, Cheng instructed Sheffield to move Tarver from full time employment to part-time, reducing her weekly hours from 40 to 32, but to give her a raise of $.50 cents per hour.  Neither Sheffield nor Tarver requested this change in status, either formally or informally.  To

---

[4]Sheffield acknowledges that although he had agreed to excuse this Wyoming trip at the time he hired Tarver, the SDS management "didn't agree on me giving the okay with letting her go [on the trip]." (doc. 44, Ex. 85 at 64).

explain that status change, Cheng advised Sheffield that Tarver had missed too much time off of work, and that the company would lose money if she were a full time employee with benefits.  In his deposition, Cheng stated that he cut Tarver to part-time because Michael Chan told him that she was going to take some days off in the future to take care of her baby.  This employment change was effective on February 16, 2005.

Tarver was upset when Sheffield communicated the change in her employment status, and Sheffield and Hester understood that she was upset.  In her deposition, Tarver testified that Sheffield explained to her that "I was going to cost the company money if they gave me my benefits."  (Doc. 44, Ex. 83, at 273-4.)  As further explanation for the change to part time, Sheffield told Tarver that Michael Chan did not like her because she was a woman.

Following her change to part-time status, Tarver was no longer able to afford Peyton's around-the-clock nanny, so she let the nanny go, and had to take time off of work to care for the baby.  On February 21, 2005, five days after her change to part-time status, Peyton's doctor gave Tarver a work excuse which she provided to SDS, asking the company to excuse her from work to care for Peyton for a period of two months.  Peyton's doctor issued a second excuse on March 14, 2005.  Tarver did not return to work after February 21, 2005, and she was not paid for work after that date.  SDS did not terminate her, nor did she submit a letter of resignation.

On May 16, 2005, Tarver filed a charge of discrimination with the EEOC, and under the section entitled "CAUSE OF DISCRIMINATION BASED ON," Tarver checked the boxes for "Sex" and "Retaliation" but not the box for "Disability."  Tarver's notarized signature on the charge was dated May 5, 2005 and the narrative attached to the charge was dated May 12, 2005.

Upon receiving notice of Tarver's EEOC charge, Cheng asked Sheffield to write a

7

supervisor's report to the EEOC and then to re-write it until Cheng was satisfied with the wording.  Sheffield felt that the revised supervisor's report dated June 16, 2005 was a misrepresentation of the truth, because the revised report states that "[Tarver] was given a 90 day evaluation on 12-13-04" and yet, SDS did not treat the December 2004 evaluation as a 90-day evaluation at the time.  (doc. 44, Ex. 77).

Cheng then sent a letter dated June 17, 2005 to the EEOC, denying that SDS had discriminated against Tarver and insisting that the EEOC notice was the first time that he had been advised of Tarver's claims of discrimination.  In that letter, Cheng acknowledged that Tarver's probation period was extended past 90-days and attributed that extension to a change in company ownership during October of 2004.  However, Cheng stated that a final review of her probation occurred on January 16, 2005 and was based on her supervisor's report and attendance record.   Cheng further explained:

> In addition, it was our management's understanding that she was going to adopt a baby and required time off to care for the new born.  The company decision at that time was to balance her need (flexibility of time off) and company's need (steady full time attendance) instead of terminating her employment. . . .In addition, company raised her hour rate by 50 cent to show appreciation of her work.

(doc. 44, Ex. 3 at 1).

Sometime in the summer of 2005, after receiving the EEOC charge and before she began working at any new job, Cheng called Tarver on the telephone and asked her to come back to work.  Tarver refused.

On August 10, 2005, after Cheng's phone call, Tarver successfully applied for employment as a welder with Metal Samples, requesting and receiving a rate of pay of $13 an

hour.  This was her first job application after quitting work at SDS.  Even though Metal Samples

offered Tarver health insurance benefits in September 2005, she declined the coverage because

she preferred to keep Peyton on Medicaid.  Eventually, Medicaid contacted Tarver for screening

purposes, and she advised Medicaid of her job.

After Tarver started a different job with Metal Samples, the EEOC investigation

continued.  In a second letter to the EEOC, dated September 1, 2005, Cheng further explained

SDS's treatment of Tarver:

> After Ms. Tarver['s] probation period, SDS offered part time position to
> her because our understanding that she [was] going to have more
> missing work dates and her later attendance concurred our
> understanding.  SDS treated Ms. Traver [sic] employment "SAME" as
> her male co-worker in the welding department.  Her attendance with
> missing working dates were much more than Mr. Kenny Browning and
> Mr. Michael Bright.  SDS offer her part time employment is somewhere
> between regular employment and terminated employment.  Ms Traver's
> [sic] situation is most suitable for part time employment at SDS and
> SDS has been flexible to work with her.

(doc. 44, Ex. 5, at 2).

On October 5, 2006, the EEOC issued its determination, finding reasonable cause to

believe that Tarver's job was reduced to part-time because of her sex, in violation of Title VII.

On October 26, 2006, Cheng sent a third letter to the EEOC, requesting reconsideration of its

determination.  In that letter, Cheng stated:

> Ms. Tarver's employment status was changed to part-time, based
> upon her unique circumstances relating to her adoption of an infant
> child.  Her attendance was not within the normal standards for full
> time employment, and a copy of her attendance record has been
> provided, including a doctor's statement requesting she be allowed
> time off for infant child care.  It is significant to note here that she
> was reduced to part-time status in order to accommodate her request
> for time to be with the infant child, and she was given an increase in

pay of $.0.50 per hour.
* * *
The finding statement that no male welders were similarly demoted
is not based with consideration of the fact that no male welders
were in the <u>same</u> unique circumstances of Ms. Tarver, meaning
that we had no male welders requesting time off due to infant
adoption and infant care demands on their time. Regarding the
finding that male welders with similar attendance records were not
demoted, it can be shown that they were disciplined according to
company policy.  Mr. Michael Bright, as a case in point was
discharged due to excessive poor attendance. . . .Further, another
male welder with attendance problems, Kenneth Browning quit his
employment in order to avoid discharge.

(doc. 44, Ex. 9, at 1-2).

As part of the EEOC investigation of Tarver's charge, J.W. Furman of the EEOC

conducted an on-site visit of SDS and interviewed Cheng on March 21, 2006.  Furman's notes of

the interview reflect that Cheng stated he cut Tarver's hours to part-time because "she had

adopted a newborn and that new mothers needed to be at home with their babies." (doc. 44, Ex.

87 at 11).  At that interview, Cheng confirmed that Tarver did not request to be cut to part-time

and that he had not discussed the issue of reduction in hours with Tarver before making his

decision.  Furman's notes also reflect that Cheng acknowledged hearing that "the baby had

medical problems, and he was afraid if the medical expenses were high, his premiums would go

up." (doc. 44, Ex. 87 at 12).  In his deposition testimony, Cheng denied telling Furman in that

interview that he was concerned about health insurance expenses because Tarver's baby had

problems.

**Comparators**

At the time of Tarver's 2004-5 employment with SDS, SDS did not employ any other

female welders.  The two male "comparators" that Tarver identifies are Kenneth Browning and

10

Michael Bright.

1.  Kenneth Browning

Browning successfully re-applied to SDS for employment as a welder on January 11, 2005 and received an hourly wage of $12, the same as Tarver received.  Browning's job application reflected that his most recent welding experience had occurred in 2001.  Because he had previously worked for SDS and received a welding certification within the last five years, SDS did not require Browning to take a certification test in 2005.  Although Browning's "Record Master" sheet did not list him as a Class "A" welder on the date of his hiring, Sheffield testified that Browning qualified as a Class "A" welder upon hire, but that Hester had not yet obtained his classification from Sheffield when she filled out his sheet.  By the date of his 30-day evaluation, Hester had confirmed with Sheffield that he was a Class "A" welder and noted that classification on the record at that time.

On March 3, 2005, over sixty days after his re-hire, Browning received a 30-day evaluation that included "Satisfactory" on all items.  This evaluation indicated that Browning, like Tarver, required supervision.  Whereas Sheffield rated Tarver's quality of work as "great" on her first evaluation, he rated Browning's quality of work as "good." (doc. 41-9, at 4).   With respect to Browning's productivity, Sheffield indicated that "Kenny is new on the jobs he does and with time on the job will get faster."  (doc. 41-9, at 4).

Five months after his hiring date, on June 16, 2005, Browning received a 90-day evaluation listing all "Satisfactory" ratings, with Sheffield noting that his work quality was "good" and that he "finishes all of his jobs."  (doc. 41-9, at 5-6).  In his deposition testimony, Sheffield rated Browning's welds as "mediocre."  (doc. 44, Ex. 85, at 45).  Some time in June or

11

July of 2005, Browning received a raise of twenty-five cents per hour.   Within his first 90 days

of service with SDS in 2005, Browning was late or left early sixteen times[5], two of which were

excused, and was absent four days, three of which were excused.  In response to his attendance

infractions, SDS did not reduce Browning to part time, warn him or discipline him.  SDS records

reflect that Browning resigned his job in September of 2005, and the Termination Report

indicates that his attendance, initiative, and quality of work were "U" (unsatisfactory) and that

the company would not rehire him.  (doc. 41-9, at 70).[6]

2.  Michael Bright

Michael Bright worked for SDS as a welder on four occasions.  His first job with SDS

was in 2000, and he earned $11 per hour.  In 2001, he worked for SDS a second time, earning

$12.50 per hour, and during his 2002/2003 job with SDS, he earned $14.50 per hour.  When SDS

re-hired Bright for the last time on December 28, 2004, listing him as a Class "A" welder, Bright

received $14.50 an hour, the same salary he was making when he last worked for SDS.  His job

application reflected that he requested $14.50 per hour and further noted that his most recent

welding experience had occurred in 2003.   Although Sheffield had problems working with

Bright in the past, he hired Bright because he was in dire need of welders.  Sheffield testified that

because of Bright's work history, he viewed Bright as a "contractor" – "almost like part time" –

and did not anticipate that Bright would be at the company more than a few months.  (doc. 44,

Ex. 85, at 116, 120).  However, Bright's application with SDS checked "Full Time" and not the

---

[5]Seven of these "late" designations involved Browning's clocking in one *minute* late.

[6]Although Cheng's June 2005 letter to the EEOC indicates that Browning quit to avoid being fired, the facts do not support that statement, at least with respect to the period of employment ending September 2005.

other choices of "Part Time" or "Temporary." (doc. 44, Ex. 36).

On March 4, 2008, approximately two months after he was re-hired, Bright received his 30-day evaluation, receiving satisfactory marks except in the availability category, where he received a "Decreased Performance" rating; Sheffield noted that "Michael needs to work on his attendance" and listed his quality of work as "good." (doc. 41-9, Ex. 2, at 94). The evaluation also indicated that Bright needed supervision. SDS attendance records reflect Bright did not work a full 90 days after his hire. However, during the period in 2005 that he worked for SDS – January 3, 2005 through March 17, 2005 – Bright was absent three days, one of which was excused, was late six times[7], left work and came back three times, one of which was excused, and left early once. Notes from Carl Jones in Bright's employee folder state that after the company issued a memorandum prohibiting cell phone use in the weld shop, Bright continued to use the cell phone in the shop, requiring SDS personnel to talk to him on 3/4/05, 3/7/05 and "many other times" about his inappropriate cell phone use. (doc. 41-9, at 92). On March 18, 2005, Bright was absent from work, and Sheffield saw Bright working at a job for another employer. On March 21, 2005, after Bright left SDS and began working at another job, SDS issued a warning to Bright regarding attendance violations and dismissed him.[8]

The EEOC issued to Tarver a Notice of Right to Sue on or about June 6, 2007. Tarver filed the instant suit on August 29, 2007.

---

[7]Two of the times Bright was late, he clocked in only one *minute* late.

[8]Although Cheng's letter June 2005 to the EEOC indicates that SDS fired Bright for poor attendance, these facts indicate that Bright quit first and then was discharged.

## II.  STANDARD OF REVIEW

Summary judgment is proper under Rule 56 of the Federal Rules of Civil Procedure "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact . . . ."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "[A] party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying [the evidence that demonstrates] the absence of a genuine issue of material fact.  *Id.*  at 323.  After the moving party demonstrates an absence of evidence to support the nonmoving party's case, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).  If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).  Disagreement between the parties is not significant unless the disagreement presents a "genuine issue of material fact."  *Anderson*, 477 U.S. at 247-48.  A dispute of material fact is genuine if a reasonable jury, applying the relevant law to the evidence presented, could return a verdict for the nonmoving party.  *See Wright v. Sanders Lead Co.*, 2006 WL 905336, *8-9 (M.D. Ala. 2006) *aff'd,* 217 Fed. App'x 925 (11th Cir. 2007) *(citing Barfield v. Brierton*, 883 F.2d 928, 933 (11th Cir. 1989)).

When considering a motion for summary judgment, a court must view the facts "in the light most favorable to the non-moving party . . . . ."  *Harris*, 127 S. Ct. at 1776.  The court does not "weigh the evidence and determine the truth of the matter" but rather, simply focuses on whether a genuine issue of material fact exists.  *Anderson,* 477 U.S. at 249.   Where a reasonable

fact finder may "draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." *Allen v. Bd of Public Educ. for Bibb County*, 495 F.3d 1306, 1315 (11th Cir. 2007). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23.

## III.  DISCUSSION

### A.  Count I: Violation of the Equal Pay Act

In Count I of her Complaint, Tarver alleges that SDS violated the Equal Pay Act ("EPA") "by discriminating against Tarver regarding her wages due to gender." (doc. 1, at 5). The Complaint alleges that SDS paid $12.00 per hour to Tarver, a female Class "A" welder, and compares those wages to those provided to two male welders at SDS: Kenneth Browning who received $12.00 per hour and allegedly was not a Class "A" welder; and Michael Bright, who received $14.50 per hour and qualified as a Class "A" welder. SDS claims that it cannot be liable to Tarver under the Equal Pay Act because Tarver's claim is time-barred and because Tarver has not established a *prima facie* case of an EPA violation.

The EPA requires that a plaintiff bring an action within two years after the cause of action accrued except for willful violations of the act, which must be brought within three years after the accrual. 29 U.S.C. §255. Tarver filed this action on August 29, 2007. Thus, for her action to

be timely, the action must have accrued on or after August 29, 2005 unless the violation was willful; a willful violation must have accrued on or after August 29, 2004.

The evidence reflects that SDS re-hired Tarver in September of 2004, re-hired Michael Bright in December of 2004, and re-hired Kenneth Browning in January of 2005. The evidence further reflects that Tarver did not return to work or receive wages from SDS after February of 2005 and that sometime before August 10, 2005, she turned down SDS's offer to return to work. By any method of calculating the accrual of this action, Tarver's action was untimely unless the EPA violation was willful.

SDS insists that Tarver did not plead a willful violation in her Complaint. The court acknowledges that Count I, which alleges an EPA violation, does not use the specific term "willful." However, rather than dismissing that count based on Tarver's failure to use one technical word, the court notes that Count I states SDS's acts were committed "oppressively, fraudulently, and maliciously[9]." (doc. 1, ¶ 23). Finding that Count I sufficiently conveys an allegation of SDS's voluntary, conscious violation, the court will deem Count I to plead a "willful" violation within the meaning of Section 255 of the EPA.

The court next turns to the evidence of record to see if it supports a *prima facie* case that SDS *willfully* violated the EPA. "To establish that the violation of the Act was willful in order to extend the limitations period, the employee must prove by a preponderance of the evidence that his employer either knew that its conduct was prohibited by the statute or showed reckless

---

[9]Black's Law Dictionary defines "malice" as "the intentional doing of a wrongful act without just cause or excuse, with an intent to inflict an injury or under circumstances that the law will imply an evil intent." It defines "willful" as "proceeding from a conscious motion of the will; voluntary," and the Eleventh Circuit's application of the term "willful" in this context is noted above. These terms are sufficiently similar to meet the requirements of notice pleading.

disregard about whether it was.  The Code of Federal Regulations defines reckless disregard as the 'failure to make adequate inquiry into whether conduct is in compliance with the Act.'" *Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.*, 515 F.3d 1150, 1162-63 (11th Cir. 2008) (internal citations omitted).

As SDS points out in its brief, the evidence reflects that welder supervisor Wil Sheffield is the SDS employee who sets the initial pay rate of welders, subject to the approval of Chan and Cheng.  Specifically, during the time period at issue in this suit, the evidence reflects that Sheffield set Tarver's initial pay at $12.00 per hour, Browning's initial pay at $12.00 per hour, and Bright's  initial pay at $14.50 per hour.  In Tarver's deposition testimony and her responses to the undisputed facts in SDS's brief, she denied making any claims that *Sheffield* discriminated against her because of her gender, and she acknowledged that she was aware of no evidence that Sheffield – or anyone else at SDS – intentionally set her pay at a rate that violated the EPA or had reason to believe that her pay rate violated the EPA.

The court assumes that the decision whether the employer acted willfully for the purposes of determining the statute of limitations period normally would be one for the jury to decide.  *See Alvarez*, 515 F.3d at 1163 n.3.  However, Tarver's admissions regarding the lack of such willful conduct mean that no genuine issue of material fact remains on this claim and thus, those admissions bar her claim under the EPA.  Accordingly, the court finds that the two-year statute of limitations bars Tarver's claim under Count I,  and Count I must fail as a matter of law.  The court will GRANT SDS's motion for summary judgment with respect to Count I of the Complaint, and will DISMISS that count.

### B.  Counts II-V:  Title VII Violations

Counts II - V allege violations of Title VII.  SDS argues that summary judgment is appropriate on each of these claims because of procedural and substantive deficiencies.  The court will address the procedural argument first, as it applies to all of the Title VII counts,  and then address each count separately on the substantive arguments.

### 1.  Alleged Procedural Deficiencies in Tarver's EEOC Charge

SDS argues that Tarver's EEOC is deficient because Tarver "only verified the information on the first page of her EEOC charge, which does not set forth any factual allegations establishing discrimination."  (doc. 40, at 19).  SDS's challenge focuses on the fact that the notarized signature is dated May 5, 2005 and the attached sheet listing the charge of discrimination particulars is dated May 12, 2005.  Both of these dates are prior to May 16, 2005, the date that the charge was filed with the EEOC.  However, SDS argues that Tarver's notary verification could not have encompassed the narrative on the attached page, since that narrative was composed after the notary date. In further support of its position, SDS presents Tarver's deposition testimony that she does not recall whether she read the narrative or whether the narrative was attached to the charge when she signed it.

Courts are "extremely reluctant to allow procedural technicalities to bar claims brought under [Title VII]." *Gregory v. Georgia Dept. of Human* Res., 355 F.3d 1277, 1280 (11th Cir. 2004) (quoting *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 460-61 (5th Cir. 1970)).   This court, too, is reluctant to apply Title VII's administrative exhaustion requirement in an overly harsh manner that elevates form over substance and defeats the interests of complainants whom the Act was designed to protect.   While acknowledging the importance of abiding by the

18

procedural requirements of Title VII,  the court finds that Tarver complied in all meaningful ways with the requirement that she exhaust her administrative remedies.  Although SDS's brief in support of its motion lists a number of cases supporting summary judgment based on a non-verified EEOC charge, the court finds those cases to be distiguishable.

In the instant case Tarver's EEOC charge was indeed verified; it was filed within the prescribed time and contained all of the required elements, including a notarized signature. Although the notary date was prior to the date of the narrative that was attached and incorporated by reference into the charge, both dates were prior to the date of the charge's filing, and the EEOC processed the charge as a compliant document and proceeded to investigate it.  And, in light of the fact that Tarver is not a lawyer and further, that she filed the charge approximately three years before her deposition testimony, her inability to recall at her deposition exactly what she read before signing the charge verification is hardly surprising.  She does not now claim that the narrative is inaccurate.  Noting that SDS suffered no prejudice from any technical defect, the court finds that Tarver has exhausted her administrative remedies and that the "problem" raised with her EEOC charge does not prevent her from presenting her Title VII claims.  Accordingly, the court  will proceed to address the substantive Title VII arguments.

**2.  Count II: Title VII Violation/Disparate Treatment Based on Gender**

In Count II of her Complaint, Tarver alleges that SDS treated her differently than male welders: "As a result of learning of Tarver's plans to adopt a baby, management at SDS failed to perform Tarver's 90-day evaluation as promised and cut her hours to that of a part time employee thereby reducing her pay and denying Tarver full time benefits, including health insurance." (doc. 1 ¶ 28).   To prevail on her disparate treatment claim, Tarver must prove

19

> (1) a discriminatory animus toward [her]. . . , (2) an alteration in the terms and conditions of [her] employment by the employer, and (3) a causal link between the two.

*Llampallas v. Mini-Circuits, Lab, Inc*., 163 F.3d 1236, 1245-6 (11th Cir. 1998) (footnote omitted).  Tarver points to SDS's reduction of her work hours from 40 to 32 hours per week as a discriminatory adverse employment action upon which her disparate treatment claim revolves.

Tarver's evidence reflects that she completed her initial 90 days of service with SDS and that, despite her receipt of satisfactory work evaluations, SDS unilaterally cut her hours per week from 40 to 32 and refused to give her permanent employee status.  To prove a discriminatory animus, Tarver  presents evidence that SDS treated male welders differently.  Tarver identifies Kenneth Browning as a comparator and presents evidence that he completed his 90 days of service, also with satisfactory evaluations but with less favorable comments on those evaluations. Although Tarver was absent 29 unexcused *hours* during the 90-day probationary period, including three entire days and two afternoons that she left early, Browning did not enjoy a stellar attendance during his probationary period: he was late or left early on 14 occasions that were not excused and was absent one entire day without an excuse.  Because SDS's employee handbook equates two tardies/leave early with an unexcused absence, Browning's unexcused absences would total eight  to Tarver's four.  Even with more attendance issues, SDS did not reduce Browning's hours.  After his 90-day evaluation, Browning received a raise.

Tarver also identifies Michael Bright as a comparator.  Although Bright did not work a full 90-day probationary period, his unexcused absences would total five or six[10] compared to

---

[10]The difference depends upon whether one counts as "late" the two occasions on which Bright was only one minute late.

Tarver's four.

Tarver presents undisputed evidence that SDS did not reduce the hours of Browning or Bright. The court finds that, in light of the evidence of Tarver's attendance compared to that of her male comparators, SDS did treat her differently from the male welders when it cut her hours to 32 per week.

Tarver must prove not only that she was treated differently from male welders but that the disparate treatment stemmed from a discriminatory motive. The evidence reflects that SDS's owner, Cheng, was the person who made the decision to reduce her hours from 40 to 32 hours per week. To establish that Cheng's motive was discriminatory, Tarver has also presented evidence that Cheng told the EEOC investigator he cut her hours to part-time because "she had adopted a newborn and that new mothers needed to be at home with their babies." (doc. 44, Ex. 87, at 11). In letters to the EEOC, Cheng made similar comments that Tarver's change to part-time was "based upon her unique circumstances relating to her adoption of an infant child" and that Tarver's "situation is most suitable for part time employment at SDS." (doc. 44, Ex. 9; doc. 44, Ex. 5). Although some confusion exists regarding the exact date that Cheng made the decision, when viewed in the light most favorable to Tarver – as the court must do at the summary judgment stage – the court must also accept the following facts: that Cheng made this decision unilaterally, without asking Tarver if she desired reduction to part-time; that Tarver did not request a reduction in work hours; that Tarver did not want a reduction in work hours, but wanted permanent employment status with accompanying benefits; that Tarver had hired a full-time nanny so that she could work full-time after adopting the baby; that Tarver did not ask for time off to take care of her baby until *after* SDS reduced her hours and she could no longer afford

to pay for a full-time nanny.  Further, the evidence reflects that Cheng made Sheffield change his

EEOC narrative describing Tarver's employment to include the incorrect statement that SDS had

given Tarver a 90-day evaluation.  Still more evidence reflects that Cheng reduced Tarver's hours

to part-time after talking to Chan, who discouraged Sheffield from hiring women, who stared at

Tarver more than the male workers, and who would shake every male welder's hand but not hers.

The court concludes that Tarver has presented direct evidence of discriminatory disparate

treatment.  Because the court finds direct evidence, it need not address SDS's argument based on

circumstantial evidence, although the court notes that Tarver also has raised genuine issues of

material fact regarding whether SDS's proffered reason for her demotion was pretextual.  The

court will DENY SDS's motion for summary judgment with respect to Count II of the

Complaint.

### 3.  Count III: Title VII Violation/Pay Disparity

Unlike her Count I claims under the EPA, Tarver's Title VII claims for disparate pay face

no statute of limitations bar under the facts presented.  However, as the court noted in the

discussion regarding the Equal Pay Act, Tarver makes no claim that Sheffield discriminated

against her, but limits her claims of discrimination to actions by Cheng and Chan. Because

undisputed evidence reflects that Sheffield is the person who set her pay rate and the pay rate of

her comparators, Michael Bright and Kenneth Browning, no genuine issue of material fact

remains on this claim.  Accordingly, the court will GRANT SDS's motion for summary

judgment with respect to Count III and will DISMISS Count III of the Complaint.

### 4. Count IV: Title VII Violation/Constructive Discharge

In Count IV of her Complaint, Tarver alleges that SDS's actions of paying her less than

22

similarly situated male welders, reducing her status from full-time to part-time with an accompanying reduction in pay, and causing her to lose eligibility for health insurance benefits represented a constructive discharge.[11]

To establish a constructive discharge, an employee must prove that the "working conditions were so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Wardwell v. School Bd. of Palm Beach County, Fla.,* 786 F.2d 1554, 1557 (11th Cir. 1986).  In other words, to support a claim of constructive discharge, the working situation must "rise to the intolerable level." *Id*. at 1558.  While a discriminatory employment action may be relevant to the issue of whether SDS constructively discharged Tarver, it is not always sufficient to support a finding of constructive discharge.  *See id.* at 1557 (stating that evidence of discrimination such as a discriminatory refusal to promote is not always sufficient to support constructive discharge); *Bourque v. Powell Elec. Mfg. Co.*, 617 F.2d 61, 65-66 (5th Cir. 1980) (finding that "discrimination manifesting itself in the form of unequal pay cannot, alone, be sufficient to support a finding of constructive discharge").

Tarver argues that one of the circumstances that made her demotion to part-time intolerable was the fact that she was adopting a child expected to have medical problems, and the eligibility for health benefits that came with the full-time job were crucial given those personal circumstances.  Yet another important circumstance was also related to the adoption:   Tarver

---

[11]In a footnote of its brief, SDS argues that Tarver's EEOC charge does not encompass a charge for constructive discharge.  Tarver does not use the term "constructive discharge"  in her narrative incorporated into the EEOC charge, nor does she specifically state that SDS terminated her, but her charge does state that she was "forced to take a leave of absence due to the fact that I could not afford to pay my baby-sitter once I began receiving part-time salary." (doc. 44, Ex. 1).  The court deems that this language in the charge includes a constructive discharge claim.

could only afford to pay the baby's full-time nanny if she continued to receive a full salary; when she was demoted and received less money, she had to let the nanny go and stayed home with her child.

The law does not generally support a claim of constructive discharge "where the burdens are caused by personal circumstances and not working conditions." *Sauvage v. Snow*, 413 F. Supp. 2d 1289, 1301 (M.D. Fla. 2005) (finding that the medical condition of plaintiff's wife could not provide the basis for a claim of intolerable working conditions and constructive discharge under the ADEA); *see also Cherchi v. Mobil Oil Corp.*, 693 F. Supp. 156, 163  (D. N.J. 1988), *aff'd*, 865 F.2d 249 (3rd Cir. 1988) (finding that plaintiff's personal circumstances, such as the health problems of his mother and his problems with his girlfriend, do not constitute grounds for a claim of constructive discharge).   However, in the case of *Bradford v. Norfolk S. Corp.*, 54 F.3d 1412 (8th Cir. 1995), the Eight Circuit acknowledged that "under the appropriate set of facts a showing of personal circumstances could conceivably be relevant to a determination of constructive discharge." *Id.* at 1417.  Determining that the district court did not abuse its discretion by excluding testimony about the plaintiff's personal circumstances, the Court of Appeals noted that no evidence existed that the employer *had knowledge of those circumstances* or that the circumstances factored into the employer's adverse employment decision.  *Id.*

This court finds that the instant case represents one in which the personal circumstances *are* relevant to a determination of constructive discharge.  Unlike the employer in *Bradford*, SDS was aware that Tarver was planning on adopting and based its decision to move her to part-time upon that personal circumstance; put another way, SDS placed her personal circumstances squarely in the center of the employment decision to cut her hours.  Having arguably centered its

24

decision around her personal life, SDS cannot now claim that those personal circumstances may not support the constructive discharge claim.

SDS asserts that Tarver's argument that she could not afford to remain with SDS after the demotion is undermined by her admission that she could not work 40 hours a week, by her failure to immediately seek other employment, by her lack of knowledge about health care benefits offered at SDS, and by her failure to apply for health benefits at her next job. The court disagrees. As discussed previously, the evidence reflects that Tarver had the capability of working 40 hours a week until SDS unilaterally reduced her hours and pay so that she could not afford her full time nanny. With respect to her failure to seek other employment, the court notes that SDS apparently waited until baby Peyton was only two to three weeks old to advise Tarver of her demotion to part-time. The court will let the jury determine whether Tarver should have immediately left her tiny newborn and searched for another job, particularly in light of her loss of the ability to afford a nanny.

The final issues surrounding health insurance benefits are complicated. On one hand, SDS can hardly complain that Tarver did not fully investigate the insurance benefits available at SDS, because the company would have had to provide her with that information. It did not do so at her hiring and, in any case, the normal time for an employee to probe into that matter would be when she gained full-time, permanent employment status; however, despite Tarver's requests, SDS never notified Tarver that her employment status had changed from probationary to permanent. On the other hand, if working without health insurance benefits were so intolerable, then presumably Tarver would have jumped at the chance of acquiring health insurance at her next job, and she did not. However, the court finds that the issue whether the work situation at

25

SDS was intolerable is one best left to the jury; Tarver has raised genuine issues of material fact regarding the claim of constructive discharge, and the jury will decide them.  Having found that genuine issues of material fact exist regarding the claim of constructive discharge, the court will DENY SDS's motion for summary judgment as to Count IV.

### 5. Count V: Title VII/Retaliation

In Count V of her Complaint, Tarver alleges that SDS retaliated against her by reducing her to part-time status because she complained to her supervisor about not receiving her 90-day evaluation and not receiving a company handbook.

Title VII prohibits retaliation against an employee "because [s]he has opposed any practice made an unlawful employment practice by [Title VII], or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing [thereunder]."  42 U.S.C. §2000e-3(a).  To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show that:

> (1) she engaged in an activity protected under Title VII;
> (2) she suffered an adverse employment action; and
> (3) there was a causal connection between the protected activity and the adverse employment action.

*Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008).

In the instant case, SDS argues that Tarver does not meet element one of her *prima facie* case regarding engaging in protected activity.  The Complaint identifies her protected activity as complaints about delays in her 90-day evaluation, and related failure to receive health benefits, and a failure to receive a company handbook.  In her deposition testimony, Tarver also stated that she complained to Sheffield about Chan's staring at her.  Tarver acknowledges that she never

complained in writing to SDS management that she was the victim of discrimination and that she never complained directly to either Cheng or Chan.  She also acknowledges that she never used the word "discrimination" when complaining to Sheffield or Hester about not getting her 90-day evaluation or not getting her health insurance benefits, although she did tell Sheffield at some point that SDS was "mistreating me and treating me differently from the men."  (doc. 44, Ex. 83, at 281 ).  Even though Sheffield told her that he relayed her complaints to Cheng and Chan about not receiving her 90-day evaluation and not receiving health insurance benefits, she does not know whether he told them that she was complaining because she felt she was the victim of gender discrimination.

The court must determine whether Tarver's complaints to Sheffield – complaints that she had not gotten her 90-day evaluation and benefits and that Chan stared at her – constitute protected activity within the meaning of Title VII. SDS argues that although the evidence reflects that Tarver complained to Sheffield about the unfairness of not getting her evaluation and benefits, she did not place Sheffield and SDS on notice that she was claiming gender discrimination.  The court acknowledges that Tarver's deposition testimony often couches her complaints to Sheffield in terms of "unfairness" and not in terms of "discrimination."  Yet, those conversations also involved a discussion of Chan's staring at her, his dislike of women, and his remarks to Sheffield about spending too much time with Tarver.  In any case, the court notes that SDS's sexual harassment policy did provide for the victim of such harassment to notify her immediate supervisor, and the evidence, when viewed in the light most favorable to Tarver, indicates that she did so.

SDS also argues that Tarver has provided no causal connection between her complaints

and the change in her employment status.  To establish a causal connection, a plaintiff must

establish "that the *decision maker* was aware of the protected conduct at the time of the adverse

employment action."  *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir.

2000) (internal quotations omitted and emphasis added).  Mere complaints about work and vague

or ambiguous protests do not constitute protected activity within the meaning of Title VII if a

reasonable employer would not understand those communications to be opposition to

discriminatory conduct. *See Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292

(2d Cir. 1998) (stating the requirement that the employer must have "understood, or could

reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by

Title VII").  The words or actions of the employee must reveal a clear and unambiguous attempt

to oppose conduct that she believes violates Title VII.  *See Miller v. Edward Jones & Co.*, 355 F.

Supp. 2d 629, 643 (D. Conn. 2005) (stating that "complaints that are vague and ambiguous and

do not sufficiently articulate the nature of the harassment do not constitute protected activity").

Thus, in the instant case, Tarver must not only establish that she engaged in protected

conduct by complaining to Sheffield, but she must also establish that the person(s) who cut her

hours was aware of that protected conduct.  The evidence is undisputed that Cheng is responsible

for the adverse employment action, the decision to reduce her hours, and that he spoke with Chan

about the decision before he made it.  The evidence is further undisputed that Tarver never

notified Cheng or Chan that she considered herself the victim of discrimination either orally or in

writing prior to the decision to cut her hours and wages.  In fact, the evidence reveals that she

never spoke directly to Cheng or Chan during the time she worked at SDS.  Although the

evidence reflects that Sheffield relayed to Cheng and/or Chan Tarver's complaints *about not*

*receiving her 90-day evaluation or benefits*, the evidence does not reflect that Sheffield told them that Tarver considered herself the victim of discrimination or had otherwise engaged in protected activity.  Sheffield was not specifically asked at his deposition whether he advised Cheng and/or Chan that Tarver was complaining of *discrimination* or saying that her treatment was based on gender.  Cheng testified that he did not know that Tarver was complaining about discrimination until he got the EEOC notice, and his June 17, 2005 letter to the EEOC similarly claims that he was learning of her claims of discrimination for the "first time" as a result of that notice.  (doc. 44, Ex. 3).

The court finds that a reasonable employer would not have understood Tarver's complaints about a delay in receiving her 90-day evaluation and benefits to be a clear and unambiguous opposition to discrimination.  Because Tarver has offered no evidence that at the time Cheng made his decision to cut Tarver's hours and pay, he was aware that she engaged in activity protected by Title VII, no causal link exists.  *See Watts v. Kroger*, 170 F.3d 505, 512 (5th Cir. 1999) (stating that because the employer did not know the employee had engaged in protected activity at the time it allegedly retaliated against him, district court properly focused on the absence of a causal link and correctly held that no retaliation occurred).   Accordingly, the court finds that Tarver has not raised a genuine issue of material fact supporting a causal connection between her "protected activity" and the adverse employment action,  and her *prima facie* case of retaliation must fail as a matter of law.  Therefore, the court will GRANT SDS's motion for summary judgment as to Count V and will DISMISS Count V of the Complaint from this case.

### C.  Count VI: ADA Violation

In Count VI of her Complaint, Tarver brings a claim under the Americans with Disabilities Act ("the ADA"), 42 U.S.C. Section 12112(b)(4).  In that count, she alleges that SDS knew that Tarver was planning to adopt a special needs baby and "intentionally discriminated against Tarver by denying her the 90-day evaluation, and by changing her status from full-time to part time, thereby denying her the opportunity [for] health insurance benefits through SDS as promised."  (doc. 1, ¶ 57).  SDS argues that Tarver's ADA claim must fail because (1) Tarver did not exhaust her administrative remedies by including disability discrimination in her EEOC charge; and (2) Tarver cannot establish a *prima facie* case of disability discrimination.

Before filing suit under the ADA, a plaintiff must exhaust her administrative remedies by filing a charge with the EEOC articulating a violation of the Act.  *Fry v. Muscogee County Sch. Dist.*, 150 Fed. Appx. 980, 981 (11th Cir. 2005); *see* 42 U.S.C §12117(a) (applying remedies and procedures of Title VII to the ADA).  "A 'plaintiff's judicial complaint is limited by the scope of the EEOC investigation, which can reasonably be expected to grow out of the charge of discrimination'."  *Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1332 (11th Cir. 2000) (quoting *Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 589 n. 8 (11th Cir. 1994)).   The purpose of this requirement "is that the [EEOC] should have the first opportunity to investigate the alleged discriminatory practices to permit it to perform its role in obtaining compliance and promoting conciliation efforts."  *Gregory*, 355 F.3d at 1279 (quoting *Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 929 (11th Cir. 1983)).  The Eleventh Circuit has allowed judicial claims if they "amplify, clarify, or more clearly focus" the charges in the EEOC complaint, but has found that judicial cases based on new acts of discrimination are inappropriate.  *Wu v. Thomas*, 863 F.2d

1543, 1547 (11th Cir. 1989).

Tarver's EEOC charge includes a section marked "Cause of Discrimination" and lists various categories.  The categories "Sex" and "Retaliation" are marked with an "x" but the category "Disability" includes no such mark.  The narrative incorporated into Tarver's charge does not include the term "disability."  The last paragraph does include, however, a reference to her special needs child:

> I have been forced to take a leave of absence from the company due to the fact that I could not afford to pay my baby-sitter once I began receiving part-time salary.  The cost of childcare is cost prohibitive due to special needs of the baby requiring the added expense of a sitter with extra skills and knowledge.

(doc. 44, Ex. 1, at 2).

In response to the EEOC charge, the EEOC conducted an investigation which resulted in a "Determination" letter.  That determination letter referred to charges under Title VII and the Equal Pay Act and found reasonable cause to believe that SDS had violated those statutes.  However, the determination letter did not refer to the ADA or indicate that its investigation encompassed claims of disability discrimination.  None of the letters that Cheng wrote to the EEOC regarding Tarver's charge mentioned disability discrimination, disabled employees, or disabled relatives of employees.  None of the documents that SDS sent to the EEOC purported to relate to employees with disabilities or employees who cared for disabled relatives, although SDS obviously sent documents that related to Tarver's employment.   Although Furman's notes of her on-site visit with Cheng indicated that they discussed the medical problems of Tarver's child, Furman testified that Cheng – not Furman – first brought up the baby's health problems.  Before speaking to Cheng, Furman did not know what the baby's health problems were and even after

Cheng made a vague reference to the baby's health, Furman did not learn that his specific

problems were asthma and colic.

According to this undisputed evidence, the court concludes that Tarver's EEOC charge

did not specifically include a claim for disability discrimination, that the EEOC did not treat the

charge as a disability claim in its investigation, and that a claim for disability discrimination

could not reasonably be expected to grow out of the EEOC charge.  Thus, the court finds that

Tarver did not exhaust her administrative remedies as to Count VI's claim for disability

discrimination.  The court will GRANT SDS's motion for summary judgment as to Count VI and

will DISMISS Count VI from this action.

## IV.  CONCLUSION

For the reasons stated, the court finds as follows:

- The court will GRANT SDS's motion for summary judgment with respect to Count I of the Complaint, alleging a violation of the Equal Pay Act, and the court will DISMISS Count I;

- the court will DENY SDS's motion for summary judgment with respect to Count II of the Complaint, alleging disparate treatment based on gender that violated Title VII ;

- the court will GRANT SDS's motion for summary judgment with respect to Count III, alleging a pay disparity based on gender that violated Title VII, and the court will DISMISS Count III;

- the court will DENY SDS's motion for summary judgment as to Count IV of the Complaint, alleging constructive discharge under Title VII;

- the court will GRANT SDS's motion for summary judgment as to Count V, alleging retaliation under Title VII, and will DISMISS Count V of the Complaint from this case;

- the court finds that Tarver did not exhaust her administrative remedies as to Count VI's claim for disability discrimination; accordingly, the court

32

will GRANT SDS's motion for summary judgment as to Count VI under the ADA and will DISMISS Count VI.

The court will enter a separate Order consistent with this Memorandum Opinion.

Dated this 24th day of February, 2009.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE

33